UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
Case No. 3:09-CV-951-R

FARHAD HASHEMIAN                                                    PLAINTIFF

v.

LOUISVILLE REGIONAL AIRPORT
AUTHORITY, *et al.*                                                DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the Court on a Motion for Summary Judgment by Defendants (DN 70).  Plaintiff has filed his response (DN 75), to which Defendants have replied (DN 86). Also before the Court is Plaintiff's Motion to Strike portions of Defendants' Motion for Summary Judgment (DN 78) and Plaintiff's Motion to Strike Defendants' Reply (DN 87), to which Defendants have responded. (DN 85 & 88, respectively.)  This matter is now ripe for adjudication.  For the reasons that follow, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's motions to strike are DENIED.

## BACKGROUND

This case arises from the employment and subsequent termination of Plaintiff, Farhad Hashemian, by Louisville Regional Airport Authority ("LRAA"). Plaintiff, an Iranian, was employed at LRAA for 23 years as an Environmental Manager. Plaintiff's primary responsibility as Environmental Manager was to oversee the environmental abatement and demolition of the houses acquired by LRAA as part of its noise-relocation program. Plaintiff's direct supervisor

1

was Defendant Karen Scott, who was hired as Deputy Executive Director of Engineering and Planning in October 2004.

In August 2007, Plaintiff filed a written grievance about comments Scott made during a staff meeting regarding Plaintiff's possible favoritism toward a contractor who was bidding on a LRAA project. Plaintiff complained that Scott made these remarks because Plaintiff shared Iranian national origin with the contractor, although there was no mention of race or ethnicity during the meeting. Following a mediation between involved parties, Scott was counseled on using different methods when questioning an employee's professional or personal ethics, and Plaintiff was required to undergo conflict resolution counseling (at LRAA's expense) because of his inappropriate reaction to the events.

In the fall of 2007, Plaintiff was one of seven candidates to interview for the vacant Director of Engineering position. A four-person panel that included Defendant Steve Petty, then Director of Public Safety, conducted the initial interviews and ranked the candidates using a standard evaluation form. The top two candidates were selected for final interviews with Scott. Plaintiff, who was ranked third after the initial interviews, did not proceed in the interview process. Scott ultimately selected the second-ranked Dwight Clayton, of American national origin, for the position.

Throughout 2008, Scott and Plaintiff continued to experience conflict. During this time period, the two met with Director of Human Resources, Defendant Janet Barrow, and Plaintiff was informed that the way he discussed matters with Scott could be perceived as argumentative. On December 23, 2008, Plaintiff received a written warning for his disruption of a noise project pre-bid conference and subsequent insubordinate behavior in Scott's office earlier that month. Plaintiff insisted he had not been insubordinate, and that same day, Plaintiff filed a Charge of

2

Discrimination with the EEOC for ongoing national origin discrimination by Defendants. Plaintiff alleges retaliation against him intensified after he filed his first EEOC charge and continued until he was terminated.

Plaintiff's conflicts with Scott continued through 2009. During this time period, Plaintiff registered nine complaints and/or grievances against Defendants Scott, Barrow, Executive Director C.T. "Skip" Miller, and Deputy Executive Director of Finance & Administration, Michael Burris, who was Barrow's immediate supervisor. Plaintiff often sent lengthy memoranda accompanying his complaints, but was not satisfied with LRAA's response. On June 24, 2009, LRAA eliminated five inspectors in the Engineering Department due to budgetary constraints and lack of work. Two of these inspectors reported directly to Plaintiff. Following the layoffs, Scott and Burris met with the remaining Engineering Department managers and informed them that they would be required to assume additional duties due to the workforce reduction.

In July, Scott sent Plaintiff an email inquiring about a matter that she had requested Plaintiff take care of and indicated that she would "address [Plaintiff's] performance on this matter accordingly." In response, on July 6, 2009, Plaintiff sent an eight-page memorandum to Scott, Miller, and Burris listing twenty "factual events" that he believed demonstrated Scott's various failings as Deputy Executive Director. Following this memorandum, Miller asked Burris to place Plaintiff on paid leave to allow for a "cooling off period." On July 22, 2009, Scott and Miller conducted a reinstatement meeting in which Plaintiff received an annual evaluation. The evaluation reflected deficiencies in several areas, and Plaintiff was placed on a performance improvement plan. Also on July 22, 2009, Plaintiff filed a second Charge of Discrimination with

the EEOC. Following LRAA's receipt of his second discrimination charge, Plaintiff called into work sick, and then took Family and Medical Leave Act ("FMLA") leave on August 3, 2009.

Plaintiff was on leave until October 15, 2009, for his medical condition of coronary artery disease with angioplasty and stenting placement. While Plaintiff was on leave, all incoming phone calls were forwarded to Scott's telephone so that business-related calls were answered, and his access to LRAA's computer network remained intact. However, Plaintiff failed to reset his password upon its 30-day expiration, and the system automatically locked him out of the network. Also while he was on FMLA leave, on September 9, 2009, Plaintiff received a Right to Sue letter from the EEOC.

Upon his return to work on October 15, 2009, Plaintiff provided a note from his physician, Dr. Ishkanian, who released Plaintiff to return to work stating, "Mr. Hashemian should avoid any outside activity and unnecessary stress since he still suffers from angina pectoris." Prior to his arrival at work he was seen by Occupational Physicians Services ("OPS"). OPS conducted a thorough review of Plaintiff's medical history, conducted a physical examination, reviewed Plaintiff's job description, and determined Plaintiff could return to work with the restrictions set forth in Dr. Ishkanian's return to work note.

Upon arrival at work, Plaintiff met with Scott in regard to his work restrictions. On the same day, Miller and Burris requested further clarification of Plaintiff's restrictions from Dr. Ishkanian and OPS. Plaintiff worked a complete day on October 15, 2009, but was informed he could not work again until he produced clarification of his work restrictions. On October 16, 2009, Barrow sent a letter to OPS requesting clarification of Plaintiff's restrictions.  A second return to work note from Dr. Ishkanian was provided to OPS on October 20, 2009.  Dr. Ishkanian explained:

My patient Mr. Farhad Hashemian still suffers from partially blocked arteries. Exposure to cold weather will worsen his condition. He should refrain from outdoor related activities at all times. Mr. Hashemian's job description does not make any direct reference to outdoor work or related assignments, therefore he can perform his duties with the exception of the restriction mentioned above.

Unnecessary stress is also not good for his condition. This being any type of stress outside the routine and expected work. Imposing unreasonable deadlines can create unnecessary stress to any worker.

OPS noted on October 23, 2009, that the time limit of the restrictions had been clarified and the restrictions were permanent.

Plaintiff worked at LRAA from October 22, 2009, until November 4, 2009.  During this time LRAA took no further action regarding Plaintiff's work restrictions.  On November 3, 2009, Miller, Scott, and Barrow met to discuss Plaintiff's restrictions. They determined that, with Louisville experiencing temperatures below forty degrees for approximately five months out of the year, LRAA could not accommodate Plaintiff's restrictions without causing undue hardship on other individuals in the Engineering Department and economic hardship on LRAA. Because there were no open positions for which Plaintiff was qualified, the decision was made to terminate him. That same day, per standard procedure for involuntary terminations, Barrow requested that Petty dispatch a Public Safety Officer to the Administration Building the next day for Plaintiff's termination.

On the morning of November 4, 2009, Dwight Clayton observed Plaintiff arrive at work carrying two large, heavy duffel bags that he believed resembled gun cases. Clayton later observed Plaintiff sitting along the wall for a monthly staff meeting, which he found unusual because Plaintiff usually sat in the middle of the room. Clayton informed Petty that Plaintiff was acting abnormally. Thereafter, shortly after 8:00 a.m., Petty ordered a canine sweep of the Engineering Department and the parking lot as a precautionary measure. The sweep lasted

between fifteen and twenty minutes and was conducted while employees attended the monthly staff meeting. Plaintiff was unaware of the canine sweep until months later, when informed by an acquaintance who had heard that Plaintiff's "bags and office" were searched while he was being terminated.

Later that day, at approximately 11:30 a.m., Scott led Plaintiff to a conference room where he was terminated in the presence of Barrow and Scott.  Plaintiff was given a letter of termination which stated in part, "[Plaintiff's] permanent work restrictions prevent [Plaintiff] from fulfilling a significant amount of the essential duties and responsibilities needed in the position of Environmental Manger." Plaintiff alleges that neither the letter, nor Barrow or Scott, provided examples of how Plaintiff's permanent work restrictions prevented him from fulfilling a significant amount of his essential duties and responsibilities.

After his termination, upon return to his office, Plaintiff was instructed to pack up and leave within ten minutes and anything of his left behind would be shipped to him. Plaintiff alleges Scott and Barrow "offered no expression of empathy, humanity or any concern for [Plaintiff]." Plaintiff alleges his termination was very different from the termination of other employees who were terminated at the end of the day and allowed sufficient time to collect their belongings. Plaintiff further alleges he was not offered severance or extended medical insurance.

Plaintiff filed the instant action on December 10, 2009, against LRAA. Plaintiff also named C.T. Miller, Executive Director; Michael Burris, Deputy Executive Director Finance and Administration; Janet Barrow, Director of Human Resources; and Karen Scott, Deputy Executive Director of Engineering and Planning, each in their individual and representative capacities. Plaintiff amended his complaint on March 25, 2010 and added Steve Petty, Director of Public Safety, as a defendant both in his individual and representative capacity. On July 28,

2010, the Court dismissed a portion of Plaintiff's claims, but eleven remain outstanding at this stage of the litigation. Defendants now move for summary judgment on Plaintiff's remaining eleven claims.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I.        Plaintiff's Motions to Strike

Rule 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A court may strike portions of the pleading acting on its own initiative or "on a motion made by a party . . . before responding to the pleading." *Id.* Motions to strike under Rule 12(f) are addressed within the sound discretion of the Court, although they are generally disfavored. *Ameriwood Indus. Intern. Corp. v. Arthur Andersen & Co.*, 961 F. Supp. 1078, 1083 (W.D. Mich. 1997) (citing *Fed. Sav. & Loan Ins. Corp. v. Burdette*, 696 F. Supp. 1183, 1186 (E.D. Tenn. 1988); *FDIC v. Butcher*, 660 F. Supp. 1274, 1277 (E.D. Tenn. 1987); *FDIC v. Berry*, 659 F. Supp. 1475, 1479 (E.D. Tenn. 1987)). Striking a pleading is a drastic remedy to be resorted to only when required for the purposes of justice. *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953). A motion to strike should be granted only where there is a clear showing that the challenged defense has no bearing on the subject matter and that permitting the matter to stand would prejudice the party. *Ameriwood* at 1083.

Plaintiff has filed two motions to strike. Plaintiff's first motion requests that the Court strike "Defendants' contradictory statements regarding the warrantless search conducted on November 4, 2009" and Defendants' argument in their memorandum in support of summary judgment that Plaintiff's failure to promote claim was untimely filed. (*See* DN 78.) First, Defendants' statements regarding the November 4, 2009, search are not contradictory and should not be struck. Second, because the Court will decide the issues before it on the merits of Plaintiff's claims rather than the statute of limitations issue raised by Defendants, the Court will deny Plaintiff's motion. Plaintiff's second motion requests that the Court strike Defendants' argument

8

that Plaintiff failed to exhaust his administrative remedies and requests the opportunity to file a surreply based on Defendants' "introduction of a new defense." (*See* DN 87.) Again, because the Court will decide the issues based on the merits of Plaintiff's claim rather than a failure to exhaust theory, Plaintiff's second motion to strike and request for a surreply is also denied.

## II.   Defendants' Motion for Summary Judgment

In his response, Plaintiff has agreed to voluntarily dismiss four of his remaining claims. There being no opposition from Plaintiff, the Court grants Defendants' motion for summary judgment on Plaintiffs' claims for outrage (Counts III and XII), invasion of privacy by false light (Count XIII), and defamation (Count XIV). The remainder of the Court's opinion will address Plaintiff's remaining seven claims: national origin discrimination under Title VII against LRAA for both pre-termination conduct (Count I) and Plaintiff's termination (Count VII), retaliation under Title VII against LRAA for both pre-termination conduct (Count II) and Plaintiff's termination (Count VIII), retaliation under the FMLA against LRAA for Plaintiff's termination, unreasonable search in violation of the Fourth Amendment against LRAA and the individual defendants in both their official and individual capacities (Count X), and, finally, invasion of privacy by unreasonable intrusion upon seclusion against the individual defendants in their individual capacities (Count XI).

## A.  Plaintiff's Title VII Discrimination Claims in Counts I and VII

Title VII makes it unlawful for an employer "to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual"s race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff can establish a Title VII discrimination claim by producing either direct or circumstantial evidence of discrimination. *DiCarlo v. Potter*, 358 F.3d

9

408, 414 (6th Cir. 2004) (quoting *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)). As the Sixth Circuit has explained, "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). In other words, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Id.* at 866 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (noting that "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent")). "[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [national origin], but also that the employer acted on that predisposition." *DiCarlo*, 358 F.3d at 415 (alterations in original) (quoting *Hein v. All America Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000)).

In his response, Plaintiff lists several "examples of LRAA's predisposition and actions of discrimination" (Pl.'s Resp., 8, DN 75); thus, it appears that he contends that the record contains direct evidence of discrimination. However, many of the eleven examples Plaintiff cites appear to have no bearing on the allegations at bar: namely, that Defendants discriminated against Plaintiff based on his national origin. For example, Plaintiff mentions a number of other lawsuits brought against LRAA by former employees that do not involve allegations of national origin discrimination, or in some cases, discrimination in any form. Plaintiff also cites as direct evidence of national origin discrimination: (1) Defendants' failure to discipline Steve Tucker, an

American-born, white male, for his "continuous use of profanities" and "Abusive Behavior" toward his supervisor, in "stark contrast" with Defendants' discipline of Plaintiff; (2) Defendant Scott's refusal to extend a project's bid date for Iranian-American general contractor, Karim Momeni, "a measure that Defendant Scott has generously done for a white-male contractor in the past"; (3) Defendant Scott's inference that Momeni was Plaintiff's "friend" after Plaintiff relayed Momeni's verbal extension request, where she had not made similar inferences when he relayed the verbal requests of white, American-born contractors; and (4) Defendant Scott's extension of "favors" to "American-born, white-male owned" contractors, such as restarting the bidding process or approving invoices containing what Plaintiff considers double charges to LRAA. Contrary to Plaintiff's position, none of these instances compel the conclusion that LRAA discriminated against Plaintiff based on his national origin. Each requires the Court to draw a number of inferences before drawing the conclusion that LRAA's actions toward Plaintiff were performed with a discriminatory intent. Some require the Court to infer that Defendants' actions in other contexts—such as Scott's favoritism toward certain contractors over others is (1) discriminatory and (2) such discrimination toward outside parties supports the conclusion that Defendants' treatment of Plaintiff is similarly discriminatory. The need to draw such inferences "prevents these remarks from constituting direct evidence of discrimination." *Johnson*, 319 F.3d at 865.

Plaintiff's claims rely, then, on circumstantial evidence of discrimination. "In the absence of direct evidence of discrimination, Title VII claims are subject to the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as subsequently modified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." *Risch v. Royal Oak Police Dep't*, 581 F.3d

383, 390 (6th Cir. 2009). Under *McDonnell,* after the plaintiff has established a prima facie case of discrimination, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. 411 U.S. at 802. If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the stated reason is in fact pretext for unlawful discrimination. *Id.* at 804. The burden of persuasion remains with the plaintiff at all times. *Risch*, 581 F.3d at 391 (citing *Burdine*, 450 U.S. at 253).

In order to set forth a prima facie case of discrimination, "the plaintiff must show (1) that he is a member of a protected group, (2) that he was subject to an adverse employment decision, (3) that he was qualified for the position, and (4) that he was replaced by a person outside of the protected class [or] that similarly situated non-protected employees were treated more favorably." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995); *see also McDonnell*, 411 U.S. at 802.  The Court will apply these standards to Counts I and VII.

### Count I

Defendants move for summary judgment on Plaintiffs' Title VII national origin discrimination for certain pre-termination acts. Specifically, Plaintiff contends that the Defendants discriminated against him based on his national origin when they failed to promote him to the Director of Engineering position, hiring instead Dwight Clayton, whose national origin is American. Defendants first contend that Plaintiff's failure to promote claim is barred by Title VII's statute of limitations. To recover under Title VII, a plaintiff must first timely file a charge with the EEOC. *Vaughn v. Louisville Water Co.*, 302 Fed. App'x 337, 343 (6th Cir. 2008) (quoting *Amini v. Oberlin Coll.,* 259 F.3d 493, 498 (6th Cir. 2001)). Here, Plaintiff had 300 days to file his EEOC charge. *See* 42 U.S.C. § 2000e-5(e)(1); *Vaughn*, 302 Fed. App'x at 343. Plaintiff admits that his failure to promote claim was not filed within 300 days, but argues that

Defendants' conduct constitutes a continuing violation and, thus, is not barred by the statute of limitations.

The Court declines to address the statute of limitations issue, as Plaintiff's discrimination claims in Count I fail on their merits. First, Plaintiff's discrimination claim for a failure to promote fails because, although he can meet his burden in establishing a prima facie case, LRAA has articulated a legitimate, non-discriminatory reason for the failure to promote and Plaintiff has not shown pretext. Defendants contend that they hired Dwight Clayton over Plaintiff because Clayton was more qualified for the Director of Engineering position than Plaintiff. Defendant Scott selected five external candidates and two internal candidates, including Plaintiff, for initial interviews. (Karen Scott Aff. ¶¶ 16-17.) A panel of four, including then Director of Public Safety, Defendant Petty, conducted these initial interviews and ranked each applicant based on a standard evaluation form. (*Id.* ¶¶ 13-14, 17.) Following the interviews, Defendant Scott then selected the two top-ranked candidates, John Cosper and Clayton, for second interviews. Because he was ranked third, Plaintiff was not selected for a second interview.

Because LRAA has presented a legitimate, non-discriminatory reason for its failure to select Plaintiff as the Director of Engineering, the burden shifts back to Plaintiff to show that reason is pretext. Plaintiff may do so by showing that LRAA's stated reasons (1) have no basis in fact, (2) are not the actual reasons, or (3) are insufficient to explain Defendants' actions. *Felder v. Nortel Networks Corp.*, 187 Fed. App'x 586, 594 (6th Cir. 2006). Plaintiff first challenges Petty's appointment to the interview panel. Plaintiff asserts that Petty, "who is not an engineer, lacking education and/or experiential qualifications to rank an engineering candidate," padded the rankings in favor of Clayton. (*See* Pl.'s Am. Compl. ¶ 63, DN 16.) However, Plaintiff presents no evidence that national origin animus motivated either Scott's decision to place Petty

13

on the interview panel or Petty's less favorable scores.[1] "The Supreme Court has held that a plaintiff needs to do more than merely cast doubt on the employer's rationale; a plaintiff must create a permissible inference that [national origin] was the actual motivation for the employer's decisions." *Felder*, 187 Fed. App'x at 594 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason")). Rather, Plaintiff points out that "the Two (2) outside panelists, both highly experienced Chief Engineers for Cincinnati & Lexington Airports and both with substantial aviation engineering experience" ranked Plaintiff more highly than Clayton. (Pl.'s Resp., 23, DN 75.) Plaintiff also includes a chart he created comparing his qualifications to those of Clayton. However, Plaintiff's own beliefs about his qualifications are insufficient to call into question LRAA's business judgment about Plaintiff's relative abilities and experience. *Felder*, 187 Fed. App'x at 594-95 (citing *Williams v. Columbus Metro. Hous. Auth.*, 90 Fed. App'x 870, 873-74 (6th Cir. 2004)). Further, "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with." *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996). Thus, although Plaintiff might disagree with LRAA's placement of Petty on the interview panel or its decision to give equal weight to opinions of interviewers with varying degrees of aviation engineering experience, such does not provide any factual support for his discrimination claim.

Furthermore, none of the other pre-termination incidents that Plaintiff has described constitutes adverse employment actions. An "adverse employment action" is one that "affect[s] employment or alter[s] the conditions of the workplace." *Burlington Northern and Santa Fe Ry.*

---

[1] Defendants point out that even if Petty's rankings were excluded in computing the candidates' average scores, Clayton would still have outranked Plaintiff as the second highest ranked candidate, albeit by a smaller gap. (*See* Defs.' Mot. for Summ. J., Ex. 7, DN 70-17 & Pl's. Ex. 8, DN 82-3.)

14

*Co. v. White*, 548 U.S. 53, 61 (2006). Generally, it involves changes in the terms of employment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits," and usually "inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761; 762 (1998); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008). Examples of Defendants' allegedly discriminatory actions include (1) Scott's comments regarding Plaintiff's possible favoritism toward the Iranian-American general contractor Karim Momeni, with whom Plaintiff is acquainted; (2) Plaintiff being forced to undergo conflict resolution counseling (paid for by the LRAA) following his reaction to Scott's comments; and (3) Plaintiff receiving a written warning from Scott on December 23, 2008 for interrupting a noise project pre-bid conference twenty days earlier. None of these constitutes an adverse employment action under the above standard. Therefore, Defendants are entitled to summary judgment on Count I of Plaintiff's Complaint.

### Count VII

Defendants also move for summary judgment on Plaintiffs' claim against LRAA that he was terminated because of his national origin in violation of Title VII. Plaintiff contends that both LRAA's decision to terminate Plaintiff and the manner in which LRAA terminated Plaintiff were based upon his national origin. Defendant argues that Plaintiff has failed to establish the fourth element of his prima facie case, i.e., that he was replaced by a person outside of the protected class or that similarly situated non-protected employees were treated more favorably. *See Talley*, 61 F.3d at 1246. In his response, Plaintiff notes that LRAA "has not directly filled Plaintiff's position[, but] they have piecemealed work to American born-employees." (Pl.'s Resp., 30, DN 75.) Since Plaintiff's termination, Steve Tucker assists in putting together bids for projects and Defendant Scott has handled a number of other duties that would have been

performed by an Environmental Manager, including responding to fuel spills, asbestos removal, and coordinating access for storm water sampling. (Scott Aff. ¶¶ 102-103.) A person is not replaced if his duties are absorbed by other existing employees. *See Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009); *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 785-86 (6th Cir. 2007) ("A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.") (internal quotation marks omitted).

Plaintiff argues that the inspectors who were laid off in June 2009 were treated better when they were terminated and, therefore, a material issue of fact exists as to whether Plaintiff was treated less favorably than similarly situated individuals outside his protected class. First, to be similarly-situated, a person "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 744 (6th Cir. 2012). Here, Plaintiff has not demonstrated he is similarly situated to his alleged comparators, who did not share Plaintiff's supervisor (two reported to Plaintiff himself), were terminated for budgetary cuts rather than medical restrictions, and whose terminations did not take place during a time of escalating tensions like Plaintiff's. Second, although he points to these differences in the *manner* in which he was terminated, Plaintiff has not shown the Defendants treated him differently in their *decision* to terminate him. Therefore, Plaintiff has not satisfied his burden of proving a prima facie case of discrimination.

Further, even if the Court were to assume Plaintiff had proven his prima facie case, Defendant has offered a nondiscriminatory reason for his termination and Plaintiff has failed to demonstrate the proffered reason was pretext. Again, Plaintiff can demonstrate pretext by

showing that LRAA's stated reasons (1) have no basis in fact, (2) are not the actual reasons for his termination, or (3) are insufficient to explain Defendants' actions. *Felder*, 187 Fed. App'x at 594. "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Jordan*, 490 Fed. App'x at 742 (alteration in original) (quoting *Clark v. Walgreen Co.*, 424 Fed. App'x 467, 474 (6th Cir. 2011)) (internal quotation marks omitted). Furthermore, an employer's explanation cannot be rejected "unless there is a sufficient basis *in the evidence* for doing so." *Id.* (emphasis in original) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), overruled on other grounds by *Geiger*, 579 F.3d at 620-21).

Defendants assert that Plaintiff was terminated because his permanent medical restriction prevented him from working outdoors in temperatures below 40 degrees, leaving him unable to perform essential functions of his position. Plaintiff argues this justification is merely pretext, as his written job description did not specifically list outdoor work as part and parcel of his position as Environmental Manager. However, the record shows that among the five employees laid off in June 2009 were the final two field inspectors in Plaintiff's department whose outdoor duties Plaintiff would be required to assume. The record also shows that Defendants gathered information from Plaintiff's physicians and Occupational Physicians Services ("OPS") about the extent of his restrictions, gathered information as to how a cold-weather restriction would affect Plaintiff's responsibilities as Environmental Manager, and discussed the feasibility of accommodating the restrictions over a nearly 3-week period before ultimately deciding to terminate him. From the evidence in the record, the Court cannot conclude a reasonable trier of fact could conclude Defendants' proffered reason for Plaintiff's termination is pretext, especially

17

in light of Defendants' "reasonably informed and considered decision" before terminating Plaintiff. *Jordan*, 490 F. App'x at 743 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007)); *see also Russell v. Univ. of Toledo*, 537 F.3d 596, 605 (6th Cir. 2008) ("[T]he decisional process need not be optimal, only reasonably informed and considered").

Plaintiff has not established a prima facie case of national origin discrimination based on his termination. Further, Plaintiff has failed to show pretext. Therefore, Defendants are entitled to summary judgment on Count VII of Plaintiff's Complaint.

## B. Plaintiff's Title VII Retaliation Claims in Counts II and VIII

Title VII forbids an employer from discriminating against any an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Plaintiff has not offered direct evidence of retaliation; thus, the *McDonnell Dougla*s burden-shifting framework applies. In order to establish a claim for retaliation under Title VII, Plaintiff must show that (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to Defendants; (3) Defendants thereafter took a materially adverse employment action against Plaintiff, or Plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Johnson v. University of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000) (citations omitted).

**Count II**

In Count II, Plaintiff alleges retaliation in the form of continuing harassment. "[T]he scope of Title VII's retaliation provision is broader than that of Title VII's discrimination provision." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (citing *Burlington Northern*, 548 U.S. 53). Rather, "the adverse employment action requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace[,] . . . [but] instead protects employees from conduct that would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington Northern*, 548 U.S. at 63-68) (internal quotation marks omitted). Despite this broader standard, Title VII's anti-retaliation provision only protects an employee from retaliation that produces an injury or harm. *Id.*

Plaintiff alleges that the Defendants retaliated against him by: Scott calling him at home when he was ill; reporting him for insubordination; Scott imposing unreasonable deadlines; Scott losing her temper; not inviting Plaintiff to a project grand opening; placing him on administrative leave "for whistle Blowing activities"; giving Plaintiff a negative performance evaluation; Plaintiff receiving hostile communications from Scott; reducing Plaintiff's authority and autonomy by requiring him consult Scott prior to enacting certain decisions; terminating Plaintiff's two inspectors, thereby eliminating his work team; and removing Plaintiff's computer and phone access while he was on FMLA leave. (Pl.'s Resp., 32-39, DN 75 & 75-1.) In its July 28, 2010, Memorandum Opinion, the Court noted that: "[c]ontext matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Burlington Northern*, 548 U.S. at 68. Because discovery

had not yet been completed, the Court determined that it was unable to assess the context of the above acts.

Defendants argue that at this stage of the litigation Plaintiff has failed to establish any actions on the part of Defendants are materially adverse. In *Burlington Northern*, the Supreme Court was careful to distinguish material adversity from "trivial harms." *Id.* at 68. After all, Title VII "does not set forth a general civility code for the American workplace" and, by reporting discriminatory behavior, an employee is not thereafter immunized "from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* In response, Plaintiff conclusorily responds that "[a]ny other reasonable employee would have found the challenged action materially adverse" and cites to the portion of *Burlington Northern* that stresses the importance of context, but fails to elaborate further. Based on its review of the record, the Court finds no rational basis to distinguish the facts at bar from those in other cases holding that a plaintiff has failed to prove materially adverse actions. *See James v. Metro. Gov't of Nashville*, 243 F.3d App'x 74 (6th Cir. 2007) (employer's denial of a lateral transfer, poor performance reviews, and imposition of quotas were not materially adverse actions); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000) (noting that *de minimis* employment actions are not materially adverse); *Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir. 1999) (holding that police chief's suspension with pay was not an adverse employment action), abrogated on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

Further, assuming any one of these acts could rise to the level of a materially adverse employment decision, Plaintiff has failed to offer any proof such actions were causally connected to his discrimination complaints. To establish a causal connection, Plaintiff must "proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the

adverse action." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal quotations omitted). Plaintiff has not done so here. For example, Plaintiff alleges that Defendants' June 2009 elimination of five positions, including the remaining two inspectors in Plaintiff's department, was in retaliation for Plaintiff's continued complaints of discrimination. However, the record shows these positions were eliminated due to budgetary restraints and lack of work. Plaintiff attempts to establish a causal connection by pointing out a number of other cuts LRAA could have made in lieu of cutting the five positions.[2] However, in a Title VII claim, the role of the Court is not to evaluate the employer's business judgment, but instead to determine whether the employer was motivated by retaliation. *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). Plaintiff has not pointed to any evidence from which a reasonable juror could conclude the Defendants were so motivated.

Plaintiff's only support that the remaining acts by Defendants are causally connected to his discrimination is that "[t]he proximity in time show[s] the causal connection." (Pl.'s Resp., 40, DN 75-1.) However, temporal proximity alone is insufficient to establish this element. *Sosby v. Miller Brewing Co.*, 211 Fed. App'x 382, 387 (6th Cir. 2006); *see also McNett v. Hardin Cmty. Fed. Credit Union*, 118 Fed. App'x 960, 965 (6th Cir. 2005) ("While mere temporal proximity . . . is insufficient to demonstrate causation, the employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation *where the particular circumstances strengthen the inference of causation*") (emphasis

---

[2] Plaintiff also attaches an affidavit from former Manager of Human Resources, Lana Reinhart, in which Reinhart indicates that, following the June 2009 terminations, Defendant Barrow told her that Defendants Miller and   Scott said, "Damn, we did not get the one we wanted" in reference to Plaintiff. However, this affidavit fails to meet the requirements of Federal Rule of Procedure 56(c)(4) and the Court therefore disregards it. Fed. R. Civ. P. 56(c)(4) (affidavits must be made on personal knowledge and set out facts that would be admissible in evidence).

added). Here, Plaintiff offers no additional evidence that supports a finding of causation. Therefore, Defendants are entitled to summary judgment on Count II of Plaintiff's Complaint.

## Count VIII

In Count VIII, Plaintiff alleges retaliation in the form of termination. Defendants move for summary judgment, first arguing that Plaintiff has failed to establish a causal connection between his termination and his complaint to the EEOC. Plaintiff notes that he was fired "only two months after he received his right to sue letter" and, thus, a causal connection exists. As noted above, mere temporal proximity is insufficient to establish proximity. Here, however, Plaintiff points out an additional circumstance that he contends demonstrates a causal connection: the manner in which he was dismissed "was incongruent for someone being terminated for health restrictions." (Pl.'s Resp., 41, DN 75-1.)

Even assuming that Plaintiff has established his prima face case, Plaintiff has not offered evidence that Defendants' proffered reasons for terminating him—his medical restrictions upon return and LRAA's inability to accommodate them—were pretext for discrimination. As previously discussed, Plaintiff bears the burden of producing evidence from which a jury could reasonably reject the Defendants' reasons for termination. *Jordan*, 490 Fed. App'x at 742. Here, Plaintiff again references that he could perform the tasks specifically listed on his written job description and argues that the Defendants "kept digging until they found a loophole to get through—the issue of Plaintiff not working outside below forty degree weather." (Pl.'s Resp., 41, DN 75-1.) Thus, Plaintiff again argues that his medical restrictions did not actually motivate his dismissal. However, as discussed above, Plaintiff has not produced evidence to meet his burden of showing that "the sheer weight of the circumstantial evidence of [retaliation] makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Singleton v. Select*

*Specialty Hosp.-Lexington, Inc.*, 391 Fed. App'x 395, 401 (6th Cir. 2010) (alteration in original) (quoting *Manzer*, 29 F.3d at 1078). However, as the Court noted in its discussion of Count I, *supra*, the record shows that because the employees in Plaintiff's division were terminated, Plaintiff was expected to take on the work of those inspectors, which included outdoor duties. Plaintiff has pointed to no evidence that could reasonably undermine the Defendants' rationale for ultimately terminating him and Defendants are therefore entitled to summary judgment on Count VIII.

### C.  Plaintiff's FMLA Retaliation Claim in Count VI

Plaintiff also claims that he was terminated for having taken FMLA leave. In order to make out a prima facie case of retaliation in violation of the FMLA, Plaintiff must show (1) he availed himself of a protected right under the FMLA, (2) he suffered an adverse employment action, and (3) that there was a causal connection between the exercise of his rights under the FMLA and the adverse employment action. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). If Plaintiff establishes a prima facie case, the familiar burden-shifting approach applies. *Id.*

As discussed extensively in previous sections, Plaintiff has failed to prove Defendants' proffered reason for his termination was pretext for discrimination. In addition to his arguments raised in other sections, Plaintiff argues that, when viewing weather data to determine the effect of Plaintiff's medical restrictions on the performance of his outdoor duties, Defendants should have looked at the normal highs rather than the normal lows in determining how often the temperature would drop below 40. He argues that the average lows often take place late at night or early morning—hours he would not be expected to work. First, as Defendants point out, one example of the Environmental Manager's duties after the June 2009 layoffs is responding to fuel

23

spills and other environmental emergencies at the airport: events that "do not keep regular business hours." In any event, this criticism again improperly questions the business judgment of LRAA and does not support Plaintiff's contention that Defendants terminated him in retaliation for his return from FMLA leave. For these reasons and those discussed in previous sections, Plaintiff has failed to put forth evidence from which a reasonable juror could find that Defendants' reason for terminating Plaintiff was "more likely than not" pretext. Thus, Defendants are entitled to summary judgment on Count VI.

### D.  Plaintiff's Fourth Amendment Claim in Count X

Plaintiff alleges an unreasonable search in violation of the Fourth Amendment against all Defendants. This claim is based on the canine sweep conducted in the Engineering Department and parking lot without Plaintiff's knowledge or consent. Defendants argue the search was not unreasonable since the search was pursuant to an investigation of suspected work-related employee misconduct.

The Fourth Amendment was established to protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). In *O'Connor v. Ortega*, the Supreme Court held it is not a Fourth Amendment violation when a public employer conducts a search of an employee's office "for legitimate work-related, noninvestigatory intrusions as well as investigations of work-related misconduct." 480 U.S. 709, 725 (1987). The Court went on to hold that:

> public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances. Under this reasonableness standard, both the inception and the scope of the intrusion must be reasonable.

24

*Id.* at 725-26.

Based on the record before it, the Court determines that the canine sweep was reasonable at its inception. On the morning of November 4, 2009, Dwight Clayton observed Plaintiff carrying two large, heavy duffel bags that resembled soft gun cases into his office (Steve Petty Aff. ¶¶ 14-15; Dwight Clayton Aff. ¶¶ 10-11.) During a regularly scheduled staff meeting, Clayton thereafter noticed Plaintiff sitting with his back against the wall rather than in the audience, which Clayton had never observed Plaintiff do before. (Clayton Aff. ¶¶ 13-14.) This behavior, coupled with what Clayton perceived as high tensions in the Engineering Department, led him to report the behavior to Defendant Petty. (*Id.* ¶¶ 14-15; Petty Aff. ¶¶ 14-15.) Based on the information received from Clayton, his knowledge of Plaintiff's pending termination, and the fact that high-level LRAA executives were attending the staff meeting, Defendant Petty ordered a canine sweep after discussing the matter with his superior, Tim Bradshaw.

Plaintiff first argues Petty's decision to order a canine sweep was unreasonable because Plaintiff was slated to be terminated for work restrictions and not employment-related misconduct. However, the reason for Plaintiff's termination does not affect the reasonableness of Petty's decision to order the sweep in light of the totality of the circumstances: Clayton's report of suspicious behavior, escalating tensions between Defendants and Plaintiff, and Plaintiff's slated termination later that day. Plaintiff also argues that because the sweep was ordered based on potentially criminal conduct, the search was not work-related and therefore is unreasonable. This argument misses the mark: ensuring the safety of employees by investigating reported suspicious behavior was certainly a valid, work-related reason to order a canine sweep here. The validity of Defendant Petty's order is unaffected by the potential criminality of the same suspicious behavior. The sweep was reasonable at its inception.

The scope of the canine sweep was also reasonable. A workplace search is reasonable in scope "in scope if the measures taken by the employer are reasonably related to the search's objective and they are not overly intrusive in light of the nature of the alleged misconduct." *Gossmeyer v. McDonald*, 128 F.3d 481, 491 (7th Cir. 1997). Here, the canine sweep encompassed the parking lot and offices, common areas, and the conference room of the Engineering Department. (Petty Aff. ¶¶ 23-26; Tim White Aff. ¶¶ 8-11.) Because the canine did not indicate a finding of explosives during the sweep, no drawers, bags, cabinets, or cars were opened or searched. (Petty Aff. ¶¶ 28-30; White Aff. ¶¶ 14-15.) The sweep lasted between fifteen and twenty minutes, and took place while employees were at the staff meeting. (Petty Aff. ¶ 32; Tim White Aff. ¶¶ 12.) Plaintiff provides no evidence to the contrary, and instead reiterates the allegations in his Complaint that the search took place while he was being terminated. Plaintiff also contends the search was unreasonable because it was conducted in "secret" while employees attended a staff meeting; Plaintiff was unaware the Department was searched until months later an acquaintance informed Plaintiff he had heard that Plaintiff's belongings and office were searched while Plaintiff was being terminated. Plaintiff also contends that a more reasonable sweep would have included the staff meeting. The Court respectfully disagrees; bringing a canine unit into an active staff meeting strikes the Court as far more intrusive and improper than the search that took place in this case.

Because the canine sweep was proper both at inception and in its scope, all Defendants are entitled to summary judgment on Count X.

### E.  Plaintiff's Invasion of Privacy Claim in Count XI

Plaintiff alleges invasion of his privacy against the individual defendants based on the search of his office and personal property during his termination.   This count remains against the

individual defendants in their individual capacities only. Specifically, Plaintiff's claim involves a cause of action for unreasonable intrusion upon the seclusion of another. This cause of action applies when a party 'intentionally intrudes' upon the private affairs or concerns' of another and such 'intrusion would be highly offensive to the reasonable person.'" *Washington v. City of Georgetown*, 2009 WL 530782, *5 (E.D. Ky. March 3, 2009) (quoting Restatement (Second) of Torts § 652B).

Based on the facts above, the Court holds that Defendants are entitled to summary judgment on this claim as well. The evidence above does not indicate that Defendant Petty—the *only* Defendant who acted as a decisionmaker in ordering the sweep—did so for any other purpose than investigating what he determined to be an employee's reasonable safety concern. The Court has determined that the sweep was reasonable in scope, and Plaintiff offers no argument as to why the search in this case would be highly offensive to a reasonable person. Rather, Plaintiff reiterates that because he "believes the search was done while he was being terminated," there were no legitimate business reasons for the search. However, at this stage of the litigation, mere speculation will not suffice. *Monette*, 90 F.3d at 1177. The individual Defendants are entitled to summary judgment on Count XI.

## CONCLUSION

Defendants have moved for summary judgment on Plaintiff's remaining claims. For the foregoing reasons, Defendants' Motion for Summary Judgment on all remaining causes of action asserted by Plaintiff is GRANTED. Furthermore, Plaintiff's Motions to Strike are DENIED. An appropriate order shall issue.

CC:   Plaintiff, *pro se*
      Counsel